Filed 4/21/26  In re N.G. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.G. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>J.G.,<br><br>　　Defendant and Appellant. | F090668<br><br>(Super. Ct. Nos. JD144789-01, JD144790-01, JD144791-01)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Kendra L. Graham, Interim County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant Javier G. (father) is the father of Alvin R., Natalie G., and Nathan G. (collectively "the children"), who are the subjects of this dependency case. Father challenges the juvenile court's order issued at a Welfare and Institutions Code section 366.26[1] hearing that resulted in his parental rights being terminated. Father contends the juvenile court erred when it declined to apply the beneficial parent-child relationship exception. Father also argues that the juvenile court erred in denying his section 388 petition requesting placement of the children.

**FACTUAL AND PROCEDURAL BACKGROUND**

In March 2023, the children were taken into protective custody by law enforcement after mother's arrest for violating a domestic violence restraining order. Sacramento County Child Protective Services (Sacramento CPS) filed an original petition alleging the children were described by section 300, subdivision (b)(1). The allegations involved mother's history of engaging in domestic violence in the presence of the children and untreated anger management problem.

A social worker conducted interviews with Natalie and Alvin on March 21, 2023. Natalie, at six years of age, stated mother was fighting with a roommate before she was taken to jail. She indicated father was living in Bakersfield. Natalie had observed mother and father physically fight in the past. She described a situation where father pulled mother's hair and mother punched father in the stomach.

Alvin, at 11 years of age, recorded the fight between his mother and the roommate on his cell phone. The children and mother used to live in Bakersfield with father. Father was the stepfather of Alvin, but Alvin considered him as his father. Alvin witnessed mother and father fight approximately four times per week when they lived

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2.

together. Mother often left Alvin at home with his siblings at night, and he was unaware of where mother went.

At a continued detention hearing held on March 30, 2023, the children were detained from mother's custody and released to father with court supervision. A combined jurisdiction and disposition hearing was set for April 27, 2023.

On June 6, 2023, the allegations of the petition were found true, and the disposition hearing was continued to June 22, 2023. Sacramento CPS requested the case be transferred to Kern County based upon father's current residence. The transfer out motion was granted on June 22, 2023, and the Kern County Juvenile Court (juvenile court) accepted the case on July 19, 2023. A disposition hearing was set for August 16, 2023.

On July 20, 2023, the children were taken into protective custody after mother and father were involved in a domestic violence incident while the children were present. The Kern County Department of Social Services (department) filed both supplemental section 387 and subsequent section 342 petitions. The petitions alleged father kicked mother's leg and abdomen, pushed her with both hands, struck her with a closed fist to the chest, and attempted to strangle her. The petitions further alleged mother threw porcelain items at father, which struck Natalie's ankle. Father then threw a broken piece of porcelain at mother. Mother attempted to kick father in the head while she was on the ground.

At the detention hearing on the petitions, held on July 24, 2023, the children were ordered detained from both parents. A jurisdiction and disposition hearing for the petitions was set for August 7, 2023. The juvenile court found the allegations in each of the petitions true at a contested jurisdiction hearing. Father was served with a temporary restraining order in open court. The disposition hearing was continued to September 28, 2023.

The report for the disposition hearing on the supplemental and subsequent petitions, dated September 21, 2023, recommended the children be removed from the custody of mother and father, and family reunification services were to be provided to both parents. Father was participating in 26-week programs for domestic violence and parenting.

At the disposition hearing, the children were removed from the custody of both parents, and family reunification services were ordered for mother and father. Father was ordered to participate in counseling for child neglect/parenting, domestic violence counseling, and random drug testing. A positive drug test would require father to enroll in substance abuse counseling. Supervised visits were to occur between father and the children twice per week for two hours. A six-month review hearing was set for March 28, 2024.

### Family Reunification Period

The report prepared for the six-month review hearing, dated March 18, 2024, recommended that reunification services be continued for mother and father. Father attended 17 of 18 potential visits with the children. In October 2024, the department denied father's request to attend visits with mother due to the domestic violence concerns. In January 2024, the social worker informed mother and father that they were still unable to have joint visitation because they were observed arguing before a visit. Father was described as attentive to all the children during his visits.

Father completed his parenting classes in January 2024 and domestic violence classes in February 2024. Two of father's random drug test results were positive for alcohol, and he did not show for three of the 11 total tests. The department's assessment indicated father needed to find appropriate housing and demonstrate behavioral changes in relation to his relationship with mother. Mother was dropped from her anger management and domestic violence class, and she was not eligible for reinstatement due

4.

to her aggressive and disrespectful behavior. However, father continued to maintain his relationship with mother.

In a supplemental report, filed March 28, 2024, the department changed its recommendation to terminate family reunification services for Nathan and Natalie due to their ages. At the six-month review hearing, the juvenile court ordered continued family reunification services for both parents as to all the children. Father was ordered to submit to weekly random drug tests due to the court's concerns with father's recent positive drug test result for alcohol. The issue was identified as a "huge factor" for the 12-month review hearing set on May 16, 2024.

The report prepared for the 12-month review hearing recommended that family reunification services be terminated for mother and father and a section 366.26 hearing be set. Natalie and Nathan were placed together in a resource family home, and Alvin was placed in a separate home. The children's care providers were unwilling to provide plans of adoption or guardianship. The social worker was attempting to look for placements that could offer more permanency.

On April 2, 2024, Natalie's care provider explained that father showed her several missed phone calls from mother. He claimed he did not know why mother called his phone. On April 15, 2024, the care provider informed the social worker that Natalie reported speaking with mother during her latest visit with father. Natalie admitted that each of the children spoke to mother on the phone while father told them to whisper. Natalie's face appeared scared when questioned about the incident by the social worker, and she stated, "I don't want my parents to get in trouble." Natalie shared that her father loved mother, but the judge did not want them living together.

Alvin denied that he spoke with mother during father's visit, and he indicated that his parents were working together to get the children out of foster care. Father acknowledged that he allowed the children to speak with mother during the visit. He

denied having a relationship with mother, and he stated that he would tell mother to leave the home if the children were returned to his care.

Father admitted to drinking on his birthday, but he insisted that he was not an alcoholic. The results of father's weekly drug and alcohol tests were negative for all substances. The social worker's assessment determined the children could not be returned home because father did not understand his responsibility in protecting the children from mother and their domestic violence relationship.

The juvenile court adopted the department's recommendation at the 12-month review hearing held on May 16, 2024, and it terminated reunification services for mother and father. In making its decision, the juvenile court stated:

> "I do believe that the father is being untruthful regarding his relationship with mother. [¶] …[¶] … I do not believe he's being forthcoming. The encouragement of the children not to be truthful regarding that phone call in the visit, that is the theme throughout the case. [¶] I agree with [department's counsel], that because of this continued relationship, he fails on the second and third prong to find a substantial probability the children will be returned…"

The children were found to not be proper subjects for adoption or guardianship, and a permanent plan of placement with a fit and willing relative was ordered. A review hearing pursuant to section 366.3 was set for November 13, 2024.

### *Combined Sections 366.26 and 388 Hearing*

The department's reports for the section 366.3 review hearing recommended that a section 366.26 hearing be set for each of the children. Alvin's care providers were committed to a plan of legal guardianship. The care providers of Natalie and Nathan expressed a desire to provide a plan of adoption. At a continued section 366.3 review hearing, the juvenile court set a section 366.26 hearing for May 13, 2025.

The section 366.26 report, dated May 1, 2025, recommended that the juvenile court order a plan of legal guardianship for Alvin and terminate the parental rights of

6.

mother and father and a plan of adoption be ordered for Nathan and Natalie. Alvin had been placed in the home of his prospective legal guardians since July 2023. Natalie and Nathan had been living with their prospective adoptive parents since May 2024.

The social worker explained the differences between adoption, legal guardianship, and long-term foster care to each of the children. Thirteen-year-old Alvin stated he was open to legal guardianship because he wanted an opportunity for father to reunify with him. Eight-year-old Natalie reported she was open to adoption because she liked to live with her current care providers. She explained that she would "beg for visits" if she was unable to see her mother and father again. Four-year-old Nathan was open to adoption because he wanted to live with the care providers "forever."

The care providers for Natalie and Nathan were committed to providing a permanent plan of adoption. Natalie and Nathan formed a parental relationship with their care providers, and they depended on the care providers for their daily physical and emotional needs. Father attended 147 of 156 visits throughout the proceedings. The social worker's adoption assessment acknowledged that there was an established relationship between father and the children. The children looked forward to their visits with father, but there were no major signs of distress or difficulty during or after visits. The department believed the benefits and permanency of adoption would outweigh any detriment caused by termination of parental rights.

On May 8, 2025, father filed a section 388 petition requesting the children be returned to his custody with family maintenance services. The petition alleged father completed his case plan and avoided contact with mother for several months. Father attached several documents to demonstrate his completion of programs, attendance of AA/NA meetings, and negative drug tests. The children's best interest was alleged to be served because father was able to keep the children safe and "provide love and care forever."

The juvenile court set the section 388 petition for a hearing on the same date as the upcoming section 366.26 hearing. Both hearings were continued to allow the department to respond to father's petition. The department was provided with discretion to allow unsupervised visits between father and the children.

The department filed a supplemental report, dated June 12, 2025, which recommended the petition be denied. The adoption social worker interviewed Nathan and Natalie on May 15, 2025. Natalie was willing to have two-to-four-hour visits with father, but she did not want to spend the night at his home. She did not want to return to her father's care because she was afraid that her parents would get back together and fight again. Natalie expressed her wishes to stay with her current care providers forever.

Nathan told the adoption social worker that he did not want to participate in an unsupervised visit with father. He responded "oh no" when asked if he wanted to return to father's home. Nathan was afraid his parents would fight, and he wanted his care providers to become his mom and dad.

On June 8, 2025, the adoption social worker asked Alvin about the possibility of returning to father's home. Alvin stated, "I know if I go back home, I would be with my family, but at the same time I want to stay where I am right now." He acknowledged his previous desire to return to his parents, but he explained that he felt more comfortable in his current placement.

During a supervised visit with father on August 11, 2025, Nathan told the visitation monitor that he was ready to leave before the visit was over. The children and father began walking to the parking lot with approximately 10 minutes remaining in their visit. In August 2025, Nathan indicated that he did not want to live with mother and father. He identified his current care providers as his "mom" and "dad." Natalie reaffirmed her desire to be adopted by the care providers. She responded that she would like to continue visits with mother and father when she was asked about the possibility of

returning to her parents. Natalie felt protected in the care providers' home, and she was provided with all that she needed.

On August 29, 2025, the juvenile court held a contested hearing on father's section 388 petition and the section 366.26 hearing. Father was present and testified in support of his section 388 petition. He believed the children should be returned to his care because he completed his parenting class, domestic violence program, and substance abuse treatment. Father testified regarding his relationship with each of the children. His sobriety from drugs and alcohol provided him with a clearer mind. The last reported contact between father and mother was over one year earlier.

In closing argument, father's counsel argued that father demonstrated a change in circumstance such that it was in the children's best interest to be returned to his custody. Counsel for the children and department requested that father's petition should be denied due to a lack of changed circumstances. After hearing argument from all counsel, the juvenile court proceeded to its ruling on the section 388 petition. The juvenile court acknowledged that father had demonstrated a change in circumstances since his reunification services were terminated. However, the court concluded there was no evidence that placing the children in father's care would be in their best interest. In relation to the children's best interest, the juvenile court gave great weight to the statements the children made to the adoption social worker.

Father's section 388 petition was denied, and the juvenile court proceeded to the section 366.26 hearing. Father's counsel requested the juvenile court incorporate father's testimony from the section 388 hearing into evidence, and she argued that the beneficial parent-child relationship exception to adoption applied.

The juvenile court found Nathan and Natalie were likely to be adopted. It acknowledged father had demonstrated the first element of the beneficial parent-child relationship exception with regular visitation and contact. However, the court concluded father did not meet his burden of proving the final two elements of the exception.

9.

The juvenile court proceeded to follow the department's recommendation, and it terminated the parental rights of mother and father and selected a permanent plan of adoption for Natalie and Nathan. The juvenile court found there was not clear and convincing evidence that Alvin would be adopted. Alvin was ordered to remain placed in foster care with a permanent plan of placement with a fit and willing relative. Father filed a timely notice of appeal.

## DISCUSSION

### I.      Denial of Section 388 Petition

Father contends the juvenile court erred when it failed to grant his section 388 petition requesting custody of the children. He argues that the court abused its discretion by applying a "simple best interest test."

#### A.      Legal Principles

A petition to modify a juvenile court order under section 388 must allege facts showing new evidence or changed circumstances exist and changing the order will serve the child's best interests. (§ 388, subd. (a); *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.) The petitioner has the burden of proof by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(D).) In assessing the petition, the juvenile court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

Section 388 serves as an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528.) (*Kimberly F.*) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' …." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

10.

"The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citations.] In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citation.] The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

When determining whether a modification under section 388 would be in the best interests of the child, courts have considered several factors including but not limited to: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.)

### B. Standard of Review

We review the denial of a section 388 petition after an evidentiary hearing for abuse of discretion. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Id.* at pp. 318–319.) " 'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' " (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.) Where there is conflicting evidence, we reverse only if the evidence compels a finding for the appellant as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1529.)

### C. Analysis

In the present case, the juvenile court determined that father did not prove the children's best interests were served by granting his request. Father provided evidence that he completed his case plan, ceased communication with mother, and maintained his relationship with the children through regular visitation. These facts were understood and acknowledged by the court. However, it is irrelevant that there may be evidence which would support a conclusion contrary to that of the juvenile court. (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.) The court denied father's section 388 petition because it did not find that placing the children with father was in their best interests, given the children's need for permanency. Thus, the court properly focused on the children's permanency and stability when it considered father's request to delay the children's proposed permanent plans.

Citing to *Kimberly F.*, father argues that the juvenile court's denial of his section 388 petition was based upon the application of a "simple best interest test." !(AOB at p. 28, 31)! In *Kimberly F.*, the court of appeal rejected a trial court's use of a simple best interest test — of comparing the household and upbringing offered by the natural parent or parents with that of the caretakers — in analyzing a section 388 petition. (*Kimberly F., supra*, 56 Cal.App.4th at pp. 526–530.) The appellate court recommended a list of factors, not meant to be exhaustive, which should be considered. (*Id*. at pp. 531–532.) They are as follows: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Ibid*.)

Father's contention, however, is not supported by the evidence as there is no such comparison of households on this record. In making its decision, the juvenile court emphasized its reliance on the children's statements that they were afraid of returning to

father's care because of the possibility that they would be exposed to more fighting between their parents. Father's history of engaging in domestic violence with mother after the children were already removed from mother's care at the outset of the dependency provided an adequate reason for the court to question father's promise to remain separated from mother. The children clearly expressed their desire to remain in their current placement, and this desire was appropriately considered by the court. The evidence showed that the children were in stable placements with care providers who were committed to providing a permanent home.

At this stage in the proceedings, father's best interest is "simply no longer the focus." (See, e.g., *In re J.C.* (2014) 226 Cal.App.4th 503, 527 ["after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability"].) Father's argument that his bond with the children and completion of his case plan required a return of the children to his custody ignores the legally required shift in focus once his prior efforts failed. According to *In re Debra M.* (1987) 189 Cal.App.3d 1032, "[t]he reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it. [¶] The Legislature has expressed increasing concern with the perceived and accurate reality that time is of the essence in offering permanent planning for dependent children." (*Id.* at p. 1038, superseded by statute on other grounds as stated in *In re Eli F.* (1989) 212 Cal.App.3d 228, 234.)

Father's section 388 petition contemplated further delay in permanency for children that had remained in out of home care for over two years. His argument that the *Kimberly F.* factors warranted the relief he sought is little more than an invitation for this court to reweigh the evidence. However, it is the exclusive province of the juvenile court to evaluate credibility and determine what weight to give testimony. (*In re Laura F.* (1983) 33 Cal.3d 826, 833.) Furthermore, the juvenile court properly focused on whether

the relief father sought would advance the children's interest in permanence and stability and found otherwise. We conclude therefore the trial court did not abuse its discretion in denying father's request. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

## II. Beneficial Parent-Child Relationship Exception

Father's next contention is that the juvenile court erred when it did not apply the beneficial parent-child relationship exception to adoption. Father asserts that the juvenile court "failed to consider the primary attachment of Nathan and Natalie to Father since birth."

### A. *Legal Principles*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.) Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is

14.

on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact.  (*Ibid*.)

The second element of the exception asks whether the child would benefit from continuing the relationship.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "  (*Ibid*., quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern."  (*Caden C.*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression."  (*Ibid*.)  An adoptive home might provide a new source of stability that alleviates emotional instability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental."  (*Ibid*.)  Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' "  (*Ibid*.)

In *Caden C.*, the court held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption."  (*Caden C.*, *supra*, 11 Cal.5th at pp. 625–626.)  Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific

15.

elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id*. at p. 626.) A parent's struggles with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id*. at p. 638.)

### B.      Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id*. at pp. 639–640.) The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The standard of review of a court's determination that a parent did not meet his or her burden to prove an exception to termination of parental rights is "whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Specifically, the question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, *supra*, at p. 1528.)

### C.      Analysis

In the present case, the juvenile court determined that father did not meet his burden of proof as to the application of the beneficial parent-child relationship exception.

The parties acknowledge the juvenile court's finding that father visited regularly. However, the juvenile court did not find that there was sufficient evidence that maintaining Nathan and Natalie's relationship with father outweighed the benefits of adoption to establish the exception.

In support of his contention that the juvenile court erred in failing to apply the exception, father cites to evidence that he had positive and affectionate interactions with the children during visits. While father consistently visited the children, satisfying the first prong of the exception, he failed to identify any evidence that would compel a finding that termination of their parental rights would cause the children great harm. The evidence before the court established that the children appeared to enjoy the supervised visits that occurred with father for the two years following their removal. However, evidence that the children had pleasant visits with their father is not enough to preserve parental rights. (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant"].)

We do not find that, in making its determination, the juvenile court abused its discretion by failing to consider father's attachment to the children since birth. Viewed in its context, the juvenile court considered Natalie and Nathan's need for stability based upon their expressions of safety in the home of their prospective adoptive parents. On balance, it concluded that ongoing interactions while father continued making positive changes to his life was not as beneficial as their greater need for stability. Furthermore, the court's ruling on the exception did not consider father's inability to provide a home in comparison to the suitability of their current placement, and there is no indication that the court relied on father's present inability to fill a "parental role" to bar the parent-child relationship exception.

The evidence in the record weighed in favor of the preferred permanency option of adoption. Given the fact that Nathan and Natalie were still relatively young, showed no

distress when separating from father, and were bonded to their care providers, we find the juvenile court did not abuse its discretion. Under these circumstances, the juvenile court's ruling is entitled to a presumption of correctness, and remand is unwarranted. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its orders terminating father's parental rights were proper.

## <u>DISPOSITION</u>

The juvenile court's orders are affirmed.

DE SANTOS, J.

WE CONCUR:

DETJEN, Acting P. J.

MEEHAN, J.

18.